IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


LISA MARIE OROZCO,                              Case No. 1:16-cv-01807-SB

     Plaintiff,                                   **OPINION AND ORDER**

     v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

     Defendant.
_____

**BECKERMAN, Magistrate Judge.**

     Lisa Marie Orozco ("Orozco") brings this appeal challenging the Commissioner of Social Security's ("Commissioner") denial of her application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-34. The Court has jurisdiction to hear this appeal pursuant to 42 U.S.C. § 405(g). For the reasons explained below, the Court affirms the Commissioner's decision because it is free of harmful legal error and supported by substantial evidence.

**BACKGROUND**

     Orozco was born in September 1972, making her forty years old on December 18, 2012, the amended alleged onset date. (Tr. 26, 229.) Orozco has an associate's degree, and her past relevant work includes time as an administrative assistant clerk and computer technician. (Tr. 76,

490.) She alleges disability due to club feet, depression, arthritis, and leg, feet, back, and hip pain. (Tr. 83, 106.)

On April 30, 2013, images taken of Orozco's lumbar spine revealed "[n]o acute osseous or soft tissue abnormality" and a "[s]table appearance" when compared to images from 2011. (Tr. 332.)

On May 12, 2013, Orozco visited Dr. Raymond Nolan ("Dr. Nolan") for a consultative physical examination. Orozco reported that she was "born with club feet and underwent surgery as an infant," she experiences chronic pain in her feet, hips, and lower back, but her "foot pain is . . . the least of her issues," and she can "walk about one block" and sit and stand for thirty minutes at a time. (Tr. 347.) Based on his examination, Dr. Nolan concluded that Orozco (1) "would want to restrict bending, twisting and turning of the lumbar spine to [an] occasional basis," (2) can lift and carry twenty pounds occasionally and ten pounds frequently, (3) can sit for up to six hours in an eight-hour workday and stand or walk for up to two hours, (4) can occasionally go "up and down stairs and inclines," and (5) should "avoid walking on uneven terrain." (Tr. 348.)

On May 15, 2013, Orozco was referred to Dr. Rose Marie Reynolds ("Dr. Reynolds"), a psychologist, for a consultative psychological evaluation. Based on a clinical interview, mental status examination, and review of certain records, Dr. Reynolds diagnosed Orozco with dysthymia and a personality disorder not otherwise specified "with borderline, narcissistic and possible antisocial traits," assigned a Global Assessment of Functioning ("GAF") score of sixty-five,[1] noted that Orozco exhibited "no obvious or significant problems with concentration or

---

[1] "GAF rates overall psychological functioning on a scale of 0–100 that takes into account psychological, social, and occupational functioning." *Zabala v. Astrue*, 595 F.3d 402, 405 n.1 (2d Cir. 2010). A GAF score between sixty and seventy indicates that the patient suffers

[her] ability to persist" during the clinical interview or on mental status examination, and found that Orozco is able to "understand and remember instructions, and "maintain her home, grooming, drive, prepare meals, care for her children, [and] use the internet and cell phone." (Tr. 356-57.)

On May 17, 2013, Dr. Irmgard Friedburg ("Dr. Friedburg"), a non-examining state agency psychologist, completed a psychiatric review technique assessment. (Tr. 89.) Based on her review of the record, Dr. Friedburg concluded that the limitations imposed by Orozco's mental impairments failed to satisfy listings 12.04 (affective disorders) and 12.08 (personality disorders).

On May 20, 2013, Dr. Mary Ann Westfall ("Dr. Westfall"), a non-examining state agency physician, completed a physical residual functional capacity assessment. (Tr. 90-91.) Based on her review of Orozco's medical records, Dr. Westfall concluded that Orozco can lift and carry twenty pounds occasionally and ten pounds frequently; stand or walk up to two hours in an eight-hour workday; sit for up to six hours in an eight-hour workday; and push or pull in accordance with her lifting and carrying restrictions. Dr. Westfall also concluded that Orozco does not suffer from any postural, manipulative, visual, communicative, or environmental limitations.

In a medical source statement dated September 10, 2013, Orozco's treating physician, Dr. Maciey Druzdzel ("Dr. Druzdzel"), stated that Orozco has been diagnosed with "congenital club feet," Orozco's prognosis is "fair," Orozco's symptoms include pain in her feet, back, hips, and neck, fatigue, depression, and "diffuse arthritis," and Orozco has treated her condition with pain

---

from "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning but who is generally functioning pretty well." *Richards v. Astrue*, 370 F. App'x 727, 728 (7th Cir. 2010) (citation and internal quotation marks omitted).

medication for twelve years and will continue do so "indefinitely." (Tr. 369.) Dr. Druzdzel also opined that (1) Orozco's symptoms would interfere with her ability to maintain attention and concentration for thirty-four to sixty-six percent of an eight-hour workday, (2) Orozco can sit, stand, and walk less than two hours in an eight-hour workday, (3) Orozco needs a job that "permits shifting positions at will from sitting, standing, or walking," (4) Orozco would frequently need unscheduled work breaks, (5) Orozco's legs need to be elevated "above the horizontal" level for approximately fifty percent of the workday, even if she "had a sedentary job," (6) Orozco can rarely lift and carry less than ten pounds and never lift and carry ten pounds or more, (7) Orozco can never crouch, squat, or climb ladders or stairs, and (8) Orozco would be absent from work more than four days per month as the result of her impairments or treatment. (Tr. 369-72.) Dr. Druzdzel added that Orozco's limitations have been present since "late 2009."[2] (Tr. 372.)

On September 17, 2013, Dr. Michael Dennis ("Dr. Dennis"), a non-examining state agency psychologist, completed a psychiatric review technique assessment, agreeing with Dr. Friedburg's finding that Orozco's mental impairments fail to satisfy listings 12.04 and 12.08. (Tr. 112-13.)

Also on September 17, 2013, Dr. Myung Song ("Dr. Song"), a non-examining state agency physician, completed a physical residual functional capacity assessment. (Tr. 114-16.) Dr. Song agreed with Dr. Westfall's conclusion that Orozco can lift and carry twenty pounds

---

[2] Dr. Druzdzel initially wrote that July 17, 2013 (i.e., approximately seven months after Orozco's amended alleged disability onset date) was "the earliest date" to which his description of Orozco's symptoms and limitations applied. (Tr. 372.) On September 26, 2013, over two weeks after completing the questionnaire, Dr. Druzdzel crossed out the July 17, 2013 date, noted that it was an "error," and stated that the correct date was "late 2009." (Tr. 372; *cf.* Tr. 17, stating that Orozco applied for benefits in December 2012 and initially alleged "disability beginning September 1, 2009," Tr. 482, stating that Orozco established care with Dr. Druzdzel on January 30, 2013).

occasionally and ten pounds frequently; sit for up to six hours in an eight-hour workday; and push or pull in accordance with her lifting and carrying restrictions. Dr. Song also agreed that Orozco does not suffer from any manipulative, visual, or communicative limitations. Unlike Dr. Westfall, however, Dr. Song concluded that Orozco can sit or walk up to six hours in an eight-hour workday; needs to be limited to no more than frequent balancing and climbing of ladders, ropes, or scaffolds (postural limitations); and needs to avoid concentrated exposure to extreme cold, vibration, and workplace hazards, such as unprotected heights and machinery (environmental limitations).

On September 16, 2014, Dr. Druzdzel referred Orozco to Dr. Larry Maukonen ("Dr. Maukonen"), a neurologist, based on "pain and numbness in her upper extremities" and "questionable recurrent carpal tunnel syndrome." (Tr. 593.) Orozco complained of pain in her elbows, forearms, neck, and shoulder, reported that she experienced numbness and tingling in her hands, and stated that she underwent bilateral carpal tunnel surgery in 2010 "with resolution of her hand symptoms that lasted until several months ago." (Tr. 593.) Dr. Maukonen noted that he had previously diagnosed Orozco with "severe bilateral carpal tunnel syndrome," Orozco exhibited "5/5" strength "on individual muscle testing in the upper and lower extremities," nerve conduction studies "revealed bilateral carpal tunnel syndrome," and Orozco had "marked improvement in her nerve conduction since the study done" before undergoing bilateral carpal tunnel surgery in 2010. (Tr. 595.) Dr. Maukonen also diagnosed Orozco with bilateral tennis elbow, declined to "recommend further [carpal tunnel] surgery unless her symptoms worsen and her nerve conduction studies worsen," provided "stretching exercises for her upper arms," and suggested that Orozco "might benefit from wearing tennis elbow straps or physical therapy." (Tr. 593-96.)

On September 19, 2014, Dr. Druzdzel completed a second medical source statement at the request of Orozco's counsel. Dr. Druzdzel stated that he has served as Orozco's primary care physician since January 30, 2013, Orozco suffers from congenital club feet, osteoarthritis, fatigue, depression, and chronic pain in her neck, feet, and lower back, Orozco can lift and carry three pounds occasionally and one pound frequently, stand or walk for less than two hours in an eight-hour workday and sit for four hours, Orozco can never climb, balance, crouch, or crawl and occasionally stoop, kneel, reach overhead and at shoulder height, feel, and engage in fine and gross manipulation, Orozco's pain would interfere with her ability to sustain the attention and concentration needed to perform simple work tasks, fifty percent of the time Orozco could not sustain the attention and concentration necessary to perform simple work tasks, and Orozco would miss work at least twice a month even if she worked in a simple, routine, sedentary job. (Tr. 500-02.)

On March 5, 2015, Orozco appeared and testified at a hearing before an Administrative Law Judge ("ALJ"). (Tr. 48-80.) Orozco testified that she lives with her two teenage children, she underwent carpal tunnel surgery on both wrists in 2010, her surgeries "helped tremendously" and made her condition "a lot better it was," but her symptoms (numbness in her arms and difficulty using her "hands very long, or as far as typing goes") returned at some point in 2014, she suffers from pain in her back, neck, feet, legs, and hips, her hip pain is "the worst," she cannot "move around more than [ten] minutes at a time," she needs to change positions "from sitting to standing to walking to going to bed" because her "legs go completely numb" if she "sit[s] too long," she picks her daughter up at school five days a week and occasionally drives to the store, and her children do most of the household chores, but she tries "to do as much as [she] can." (Tr. 52-61, 66.) Orozco also testified that her typical day consists of waking up, doing

laundry, and making dinner, but she can "never finish anything" because she either needs to "go lay down for a little while" or needs "to get up and walk for a little bit"; that she took "a plea bargain" on the advice of counsel in 2008, after her former employer accused her of a financial crime; that she spent roughly "six months" helping care for a sick friend post-onset date, but did not get paid for doing so; that she experienced the "first occurrence" of tennis elbow-related pain in "May of 2014"; and that she needs to lie down "every couple of hours" due to her pain. (Tr. 62-74.)

The ALJ posed hypothetical questions to a Vocational Expert ("VE") who testified at Orozco's hearing. First, the ALJ asked the VE to assume that a hypothetical worker of Orozco's age, education, and work experience could perform "sedentary work" that involved (1) "no more than frequent climbing and balancing," (2) "no more than frequent bilateral reaching, handling, grasping, fingering, and feeling," and (3) needing "to avoid concentrated exposure to temperature extremes and vibrations, as well as moving machinery, unprotected heights, and similar hazards." (Tr. 77.) The VE testified that the hypothetical worker could not perform Orozco's past relevant work as an administrative assistant clerk or computer technician, but the worker could be employed as a charge account clerk, order clerk, and "call out operator." (Tr. 77-78.)

Responding to the ALJ's follow-up questions regarding customary tolerances in the employment setting, the VE confirmed that the hypothetical worker could not sustain gainful employment if she accumulated more than one unexcused absence per month or was off task more than five percent of the workday. (Tr. 78.) The VE added that her testimony concerning "absenteeism and being off task" was based on her thirty years of experience working as "a vocational rehabilitation counselor." (Tr. 79.) The VE also testified that the worker described in

the first hypothetical question would not be able to perform the jobs of charge account clerk, order clerk, and call out operator if she was limited to only occasional handling and fingering. (Tr. 79.)

In a written decision issued on April 9, 2015, the ALJ applied the five-step evaluation process set forth in 20 C.F.R. § 404.1520(a)(4), and determined that Orozco was not disabled. *See infra*. The Social Security Administration Appeals Council denied Orozco's petition for review, making the ALJ's decision the Commissioner's final decision. Orozco timely appealed to federal district court.

## THE FIVE-STEP SEQUENTIAL ANALYSIS

## I. LEGAL STANDARD

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are: (1) whether the clamant is presently engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant can return to any past relevant work; and (5) whether the claimant is capable of performing other work that exists in significant numbers in the national economy. *Id.* at 724-25. The claimant bears the burden of proof at the first four steps. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of those steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

## II.      THE ALJ'S DECISION

The ALJ applied the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520(a)(4), to determine if Orozco is disabled. (Tr. 17-27.) At step one, the ALJ determined that Orozco had not engaged in substantial gainful activity since December 18, 2012, the amended alleged onset date. At step two, the ALJ determined that Orozco had the following severe impairments: "club feet, carpal tunnel syndrome, and bilateral tennis elbow." (Tr. 19.) At step three, the ALJ found that Orozco did not have an impairment that meets or equals a listed impairment. The ALJ then concluded that Orozco had the residual functional capacity ("RFC") to do "sedentary work" that involves (1) no more than frequent climbing or balancing, (2) frequent bilateral reaching, handling, grasping, fingering, and feeling, and (3) avoiding concentrated exposure to temperature extremes, vibrations, moving machinery, unprotected heights, and "similar hazards." (Tr. 21.) At step four, the ALJ found that Orozco could not perform her past relevant work as an administrative assistant clerk and computer technician. At step five, the ALJ determined that Orozco is not disabled within the meaning of the Social Security Act, because she can perform other jobs that exist in significant numbers in the national economy, including work as charge account clerk, order clerk, and "call-out operator." (Tr. 26-27.)

**STANDARD OF REVIEW**

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the district court must consider the entire record, weighing the evidence that both supports and detracts from the Commissioner's conclusions. *Id.* If the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the district court may not substitute its judgment for the judgment of the ALJ. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

**DISCUSSION**

In this appeal, Orozco argues that the ALJ erred: (1) both "factually and legally" by finding that Orozco's and the lay witnesses' testimony was undermined by Orozco's "purported ability to shop," and (2) by discounting the lay witness testimony that Orozco's former employer, Mark Roger ("Rogers"), provided, "based in part on an implied relationship which is not demonstrated in the record." (Pl.'s Opening Br. at 8, 11.) As explained below, the Court concludes that the ALJ's decision is free of harmful legal error and supported by substantial

evidence. Accordingly, the Court affirms the Commissioner's denial of Orozco's application for benefits.

## I.     CREDIBILITY DETERMINATION

### A.     Applicable Law

Absent an express finding of malingering, an ALJ must provide clear and convincing reasons for rejecting a claimant's testimony:

> Without affirmative evidence showing that the claimant is malingering, the [ALJ]'s reasons for rejecting the claimant's testimony must be clear and convincing. If an ALJ finds that a claimant's testimony relating to the intensity of his pain and other limitations is unreliable, the ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive. The ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's [subjective] complaints.

*Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 597 (9th Cir. 1999) (citations omitted). Clear and convincing reasons for rejecting a claimant's subjective symptom testimony "include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistencies in the claimant's testimony or between her testimony and her conduct, daily activities inconsistent with the alleged symptoms, and testimony from physicians and third parties about the nature, severity and effect of the symptoms complained of." *Bowers v. Astrue*, No. 6:11-cv-583-SI, 2012 WL 2401642, at *9 (D. Or. June 25, 2012); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) ("[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989))).

///

///

**B.     Application of Law to Fact**

There is no affirmative evidence that Orozco is malingering and, therefore, the ALJ was required to provide clear and convincing reasons for discrediting Orozco's symptom testimony. Upon review, the Court concludes that the ALJ satisfied the clear and convincing reasons standard.

First, the ALJ discounted Orozco's testimony on the ground that it was inconsistent with objective medical evidence and Orozco's performance during certain medical evaluations. (*See* Tr. 23, stating that "the record does not support the extent to which the claimant asserts she is limited" due to a "history of club feet and related symptoms and pain," and that "the record does not show that the claimant is as limited as alleged" due to "carpal tunnel syndrome and bilateral tennis elbow"). The ALJ cited the following evidence in support of his finding: (1) "despite the claimant's back and hip complaints, imaging of these areas were unremarkable," (2) "more recently, the claimant was observed to maintain a normal gait and [exhibit] 5/5 lower extremity strength," (3) "upon examination, the claimant displayed normal deep tendon reflexes and tested negative upon straight leg testing," (4) "the claimant was observed to be able to go from sitting to standing without difficulty, her Romberg test was normal, and her squat rise maneuver was normal," (5) "range of motion testing [post-onset date] was generally unremarkable," (6) Orozco's "wrist range of motion dorsi flexion was equal to or greater than 60 degrees bilaterally, her palmar flexion was equal to or greater than 60 degrees bilaterally, her radial and ulnar deviation was normal bilaterally, her finger range of motion was within normal limits, [she] was able to make a full fist, and there was no observed joint deformities," (7) "in 2014, Tinel's test was negative over both the wrists and elbows, only mild tenderness was shown over the elbows bilaterally, and Phalen's test only caused mild discomfort," (8) Orozco "was also observed to have 5/5 upper extremity strength," and (9) Orozco's treating neurologist, Dr. Maukonen,

declined to recommend further carpal tunnel surgery, "noted marked improvements in . . . nerve conduction studies compared to those performed" before Orozco underwent bilateral carpal tunnel surgery in 2010, and recommended that Orozco treat her conditions with "conservative treatment [measures], such as stretching exercises, wearing a tennis elbow strap, and beginning physical therapy." (Tr. 23.) It was appropriate for the ALJ to discount Orozco's testimony on the ground that it was inconsistent with objective medical evidence. *See Samuels v. Colvin*, 658 F. App'x 856, 857 (9th Cir. 2016) (holding that the ALJ provided clear and convincing reasons for discounting the claimant's testimony, and noting that "an ALJ may consider objective medical evidence as a factor in his credibility analysis") (citation and quotation marks omitted); *Watkins v. Comm'r Soc. Sec. Admin.*, 611 F. App'x 903, 904 (9th Cir. 2015) (holding that inconsistent medical evidence is a specific, clear, and convincing reason for rejecting a claimant's symptom testimony).

Second, the ALJ found that Orozco's testimony was undermined by the fact that she previously engaged in substantial gainful activity while suffering from club feet. (*See* Tr. 23, noting that Orozco's "allegedly disabling club feet were present prior to the alleged onset date, as it is a birth defect, when the claimant engaged in substantial gainful activity from 2004 through the amended alleged onset date" of December 18, 2012, that "there is no evidence showing any traumatic event that would have worsened this condition, nor is there objective evidence showing that this condition is any worse that it was before," and "the fact that the claimant's impairment did not prevent the claimant from working during the noted period suggests that it does not currently prevent work"). It was appropriate for the ALJ to discount Orozco's testimony on this ground. *See Schoonmaker v. Colvin*, No. 6:14-cv-01962-HZ, 2015 WL 6658669, at *6 (D. Or. Oct. 30, 2015) ("[T]he ALJ's finding that he was able to work for many years with his

impairments, which had not significantly worsened after the alleged onset date, is supported by substantial evidence and is a reasonable basis for discounting Plaintiff's subjective symptom testimony."); *Torres v. Colvin*, No. 16-2563, 2017 WL 1437584, at *12 (D. Ariz. Apr. 24, 2017) ("Substantial evidence showing that a claimant's impairment has remained constant before and after the alleged disability onset date, and that she was able to work with the impairment prior to the onset date, will support a finding that a claimant's testimony of disability is not credible." (citing *Gregory v. Bowen*, 844 F.2d 664, 666-67 (9th Cir. 1988))); *cf.* Tr. 53, testifying that the "worst part" of Orozco's club feet-related back, neck, feet, leg, and hip pain "started maybe in '11, 2011 was when it started," Tr. 263, reporting that Orozco was born with club feet, she suffers from "back, hip, leg, and feet pain" due "to [her] feet," and her "biggest problem" is her inability to "sit, walk, or stand for long periods of time," which "make it difficult to keep a job," Tr. 325, stating that 2008 "is when [Orozco] started to not be able to sit, stand, and walk for long periods of time").

Orozco does not dispute that the findings above were clear and convincing reasons for discounting her testimony. Instead, Orozco challenges only the ALJ's finding that Orozco's testimony was undermined by her activities. (*See* Pl.'s Reply at 2, "To restate [Orozco's] argument briefly, she contends that the ALJ erred in evaluating the credibility of her subjective symptom allegations by relying far too heavily on the misconceived notion that she was able to independently shop for groceries"). As support for her argument, Orozco argues that she "did not state that she was able to shop unassisted, as the ALJ implies," and that her mother, son, and daughter "all explained that she is largely unable to go shopping on her own, and rarely does." (Pl.'s Opening Br. at 8.)

The Commissioner argues that, even assuming the ALJ erred in relying on Orozco's activities and ability to shop, the error was harmless in light of the other clear and convincing reasons cited by the ALJ.[3] (Def.'s Br. at 3.) Orozco acknowledges that under *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008), "an ALJ's error may be considered harmless if one reason for an adverse credibility finding is found be invalid, so long as other valid reason support that determination." (Pl.'s Reply at 2.) Orozco, however, argues that such an error is not harmless where, as here, the ALJ "relied excessively" on that erroneous reason. (Pl.'s Reply at 2-3.)

The Court is not persuaded by Orozco's argument. The ALJ cited Orozco's ability to shop as one of the reported activities that was purportedly incompatible with Orozco's testimony. (*See* Tr. 24, finding that Orozco's reported activities were "not as limited to the extent one would expect, given the complaints of disabling symptoms and limitations," and noting that Orozco "remains capable of cooking, cleaning, performing laundry, driving, and shopping for groceries . . . , activities that involve walking and use of the hands and elbows, suggesting that the claimant remains capable of performing sedentary work subject to the above referenced limitations"). As support for his finding, the ALJ cited the function reports completed by Orozco

---

[3] The Commissioner argues that the ALJ also cited other legally sufficient reasons for discounting certain medical opinion evidence in the record. (Def.'s Br. at 3.) Orozco does not assert that the ALJ erred in discounting any particular medical opinion. (*See* Pl.'s Opening Br. at 8,11, asserting only that the ALJ erred in discounting Orozco's and the lay witnesses' testimony based on Orozco's "purported ability to shop," and by discounting Roger's testimony "based in part on an implied relationship which is not demonstrated in the record," Pl.'s Reply at 1-5, failing to address the Commissioner's assertion that the ALJ properly discounted the medical opinion evidence, or the Commissioner's assertion (*see* Def.'s Br. at 4) that Orozco waived any challenge to the other legally sufficient reasons cited by the ALJ for discounting Orozco's testimony and medical opinion evidence, by failing to raise those issues in her opening brief). Accordingly, the Court need not address the ALJ's treatment of the medical opinion evidence. *See Thrasher v. Colvin*, 611 F. App'x 915, 918 (9th Cir. 2015) (holding that the claimant waived "two new arguments" by failing to raise those arguments in her opening brief on appeal).

and her mother post-onset date. (*See* Tr. 24, citing Tr. 271, indicating that Orozco testified on

March 17, 2013, that she is able to shop in stores for groceries once a week, but her daughter

"usually writes a list for me or she goes with [her]," Tr. 279, indicating that Orozco's mother,

Patti Bethany ("Bethany"), testified on April 15, 2013, that Orozco is able to shop for groceries

on a weekly basis, but it "takes longer than normal" and Orozco "takes all day" to "plan[] in

advance," Tr. 296, indicating that Orozco testified on August 20, 2013, that she shops "once a

week," but it takes her "a lot longer than the normal person" and is "a little difficult" to do "when

there is no income [and she] can't work," Tr. 305, indicating that Bethany testified on August 24,

2013, that Orozco is able to shop in stores for groceries, but declining to say how often Orozco

shops and how long it takes her; *see also* Tr. 321, indicating Orozco's daughter testified on

September 21, 2014, that it is "easy for [her] to go to the store [if the family] need[s] something

and [her] brother is not home," Tr. 319, indicating that Orozco's son testified on September 23,

2014, that he does "all the shopping," Tr. 58, indicating that Orozco testified on March 5, 2015,

that her son takes her shopping "[o]r he'll do it for [her], but "there's [also] times that [she]'ll

drive just if [she] need[s] something" because her house is located "right behind" a "Fred

Meyer").

 From the Court's perspective, it was reasonable for the ALJ to conclude that Orozco is

capable of shopping because she admitted at the hearing that she can shop when she needs

something. (*See* Tr. 25, noting that Orozco admitted at the hearing that she "remains capable of

shopping by herself when necessary"). The reasonableness of such an interpretation is borne out

by the fact that the evidence is somewhat equivocal about Orozco's abilities. (*See* Pl.'s Opening

Br. at 10, noting that "the statements to which the ALJ cites [in his opinion]—by the claimant, by

her children, by her mother, etc.—all . . . tell a different story," before interpreting those different

stories); *cf. Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) ("It is true that Rollins'
testimony was somewhat equivocal about how regularly she was able to keep up with all of these
activities, and the ALJ's interpretation of her testimony may not be the only reasonable one. But
it is still a reasonable interpretation and is supported by substantial evidence; thus, it is not our
role to second-guess it.").

Nevertheless, the Court concludes that, even assuming the ALJ erred in relying on
Orozco's ability to shop independently, the error was harmless because the ALJ provided other
clear, convincing, and uncontested reasons for discounting Orozco's testimony that are supported
by substantial evidence. *See Samuels*, 658 F. App'x at 857 (explaining that although "the ALJ
made some errors when describing [the claimant's] medical history, the errors were ultimately
harmless because the ALJ's other grounds for discounting [the claimant's] testimony remained
convincing" (citing *Carmickle*, 533 F.3d 1155 at 1162)); *Chesler v. Colvin*, 649 F. App'x 631,
632 (9th Cir. 2016) (holding that the ALJ provided two clear and convincing reasons for
discounting a claimant's symptom testimony, and therefore concluding that, "[e]ven assuming
that the ALJ erred in rejecting [the claimant's] symptom testimony for other reasons, any error
was harmless" (citing *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir.
2004))).

## II.     LAY WITNESS TESTIMONY

### A.     Applicable Law

An ALJ must consider lay witness testimony concerning a claimant's ability to work.
*Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009). The ALJ cannot disregard such testimony
without providing reasons that are germane to each witness. *Stout v. Comm'r Soc. Sec. Admin.*,
454 F.3d 1050, 1054 (9th Cir. 2006). "Inconsistency with medical evidence is one such reason."
*Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). "Germane reasons for rejecting a lay

witness' testimony [also] include inconsistencies between that testimony and the claimant's presentation to treating physicians or the claimant's activities, and the claimant's failure to participate in prescribed treatment." *Barber v. Astrue*, No. 10–1432, 2012 WL 458076, at *21 (E.D. Cal. Feb. 10, 2012). Furthermore, "when an ALJ provides clear and convincing reasons for rejecting the credibility of a claimant's own subjective complaints, and the lay-witness testimony is similar to the claimant's complaints, it follows that the ALJ gives 'germane reasons for rejecting' the lay testimony." *Williams v. Astrue*, 493 F. App'x 866, 869 (9th Cir. 2012) (citation omitted).

### B.     Application of Law to Fact

In his written decision, the ALJ discounted the lay witness testimony provided by Orozco's mother, Bethany, son, daughter, and former employer, Rogers (collectively, "the lay witnesses"), because (1) "they are not medically trained," (2) "by virtue of the relationship with [Orozco], they cannot be considered . . . disinterested third party witness[es] whose reports of restriction in functioning would not tend to be discolored by affection for [Orozco] and a natural tendency to agree with the symptoms and limitations [Orozco] alleges," and (3) "some [of their] statements" are "generally inconsistent" with the record evidence. (Tr. 25.) In support of the third finding, the ALJ noted that (1) Bethany testified that Orozco "struggles with walking and [that] this is worsening," yet a recent examination revealed that Orozco was able to "maintain a normal gait with normal balance," (2) Orozco's daughter testified that "she does all the shopping for [Orozco]," but Orozco admitted at the hearing that "she still remains capable of shopping by herself when necessary," and (3) Rogers testified that Orozco "took many breaks during the workday," but "examination of [Orozco] has been generally unremarkable showing 5/5 extremity strength, recent normal gait, and the ability to shop, clean, cook, and drive, suggesting [Orozco is

capable] of performing sedentary work subject to the above referenced [RFC] limitations." (Tr. 25.)

Orozco argues that the ALJ erred in discounting the lay witnesses' testimony based on Orozco's "purported ability to shop." (Pl.'s Opening Br. at 8.) Orozco also argues that the ALJ erred in discounting Rogers' testimony "based in part on an implied relationship which is not demonstrated the record." (Pl.'s Opening Br. at 11.) The Commissioner argues that the ALJ "reasonably relied on [Orozco's] ability to shop," because "she testified that she drove to the local Fred Meyer to go shopping" and reported that "she was able to run errands, such as go to the post office." (Def.'s Br. at 3.) The Commissioner, however, acknowledges that the ALJ erred "in finding that the accuracy of [Rogers'] statements was questionable because [he] was not a disinterested third party witness." (Def.'s Br. at 5.) The Commissioner maintains that the error was harmless, noting, among other things, that "an ALJ may rely on the same reasons he gave for discounting the claimant's credibility when a lay witness has given similar testimony." (Def.'s Br. at 5.) Orozco argues that the ALJ's treatment of the lay witness testimony did not amount to harmless error because "the bulk of the reasons the ALJ gave for discounting" Rogers' testimony "are invalid," and because the ALJ's written decision relied "far too heavily on the misconceived notion that [Orozco] was able to independently shop for groceries." (Pl.'s Reply at 2, 4.)

In *Molina v. Astrue*, 674 F.3d 1104 (9th Cir. 2012), the Ninth Circuit addressed an ALJ's failure to discuss lay witness testimony provided by the claimant's family members. *Id.* at 1122. The Ninth Circuit observed that the lay witnesses' testimony "did not describe any limitations beyond those [the claimant] herself described, which the ALJ discussed at length and rejected based on well-supported, clear and convincing reasons." *Id.* Since the evidence that the ALJ

referred to in discrediting the claimant's symptom testimony also discredited the lay witnesses' testimony, the Ninth Circuit concluded that "the ALJ's failure to give specific witness-by-witness reasons for rejecting the lay testimony" was harmless error because it "did not alter the ultimate disability determination." *Id.*; *see also id.* at 1121-22 (joining "the Eighth Circuit's well-reasoned determination that an ALJ's failure to comment upon lay witness testimony is harmless where 'the same evidence that the ALJ referred to in discrediting [the claimant's] claims also discredits [the lay witness's] claims.'" (citing *Buckner v. Astrue*, 646 F.3d 549, 560 (8th Cir. 2011))).

It is apparent that the ALJ erred in discounting the lay witnesses' testimony. (*See* Def.'s Br. at 5, acknowledging that the ALJ erred in discounting Rogers' testimony); *see also Marshall v. Colvin*, No. 15-1194-SI, 2016 WL 4059660, at *11 (D. Or. July 29, 2016) ("That a lay witness is not medically trained is not a germane reason to reject the lay witnesses' testimony." (citing *Bruce*, 557 F.3d at 1116)); *Sandberg v. Comm'r Soc. Sec. Admin*, No. 14-810-ST, 2015 WL 2449745, at *9 (D. Or. May 22, 2015) (noting that "[a] 'close relationship' with a claimant may be a germane reason to reject lay testimony," but "the Ninth Circuit has also ruled that claims of bias 'in the abstract' are inadequate," and that "[a] close personal relationship, without other reasons, is not sufficient to discredit a lay witness." (citing, *inter alia*, *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006), and *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009))).

It also apparent, however, that the lay witnesses did not describe any limitations beyond those Orozco herself described. (*Compare* Tr. 53-54, 56-62, 65, testifying that Orozco is unable to work due to club-feet related pain in her back, neck, feet, legs, and hips, as well as symptoms related to bilateral carpal tunnel syndrome and tennis elbow, and that as a result of those

impairments, Orozco's legs and arms go numb, Orozco cannot "move around more than [ten] minutes at a time," Orozco needs "to go from sitting to standing to walking to going to bed," Orozco cannot use her "hands very long, or as far as typing goes," Orozco's son typically does the shopping, Orozco's children do "most" of the "upkeep" and "household chores," such as cleaning, laundry, and meal preparation, Orozco can "never finish anything" because she needs to "either go lay down for a little while with [her] heating pad or [she's] got to get up and walk for a little bit," and past work customers "were getting upset" because Orozco was "taking too long," *and* Tr. 263, reporting that Orozco was born with club feet, she suffers from "back, hip, leg, and feet pain" due "to [her] feet," and her "biggest problem" is her inability to "sit, walk, or stand for long periods of time," which "make it difficult to keep a job," *with* Tr. 276, explaining how Orozco's impairments limit "her ability to work," and stating that "she can't stand, sit, or walk for long periods of time," "she is slow with everything," and "she is always in much pain," *and* Tr. 319, testifying that Orozco's son does the shopping and serves as Orozco's hands in order to prepare meals because Orozco suffers from carpal tunnel syndrome and tennis elbow, Orozco's "back, hip, and feet problems make it close to impossible for her to do anything for longer than ten minutes," Orozco often needs "to go lay down with her heating paid, or get up to stand for a bit," and Orozco's son "runs all her errands" and assists with "laundry and changing the beds," *and* Tr. 321, testifying that Orozco suffers from "issues with her hips and back due to her feet problems," cannot "bend well" or "stand, walk, or lay for long periods of time," Orozco's children "take turns" assisting "with every day things," and Orozco's daughter assists with laundry, "hair [and] make-up sometimes," and showering, although Orozco can shower on her own, *and* Tr. 323, testifying that Rogers hired Orozco "on a trial basis" despite knowing "about her problems with her feet," Orozco began "taking more frequent days off" and "more

breaks during the day to go lay down for a bit and come back," Orozco eventually "couldn't even handle a task that took longer than [twenty] minutes to do at one time" or lift a box that "weighed about [ten] pounds if she had to bend down to move it," Orozco "needed her heating pad most of the day," and Orozco started "making to[o] many mistakes [on the job] due to [her] pain").

Accordingly, the Court finds that the ALJ's treatment of the lay witnesses' testimony constituted harmless error, because the same unchallenged evidence that the ALJ referred to in discrediting Orozco's testimony also discredits the lay witnesses' testimony. *See also Perkins v. Berryhill,* No. 16-6089, 2017 WL 1380408, at *4 (C.D. Cal. Apr. 17, 2017) (stating that an ALJ's decision can "be affirmed even if the ALJ did not 'clearly link' rejection of the specific lay testimony to the reasons expressed for rejecting the claimant's similar testimony" (citing *Molina,* 674 F.3d at 1121).

## CONCLUSION

For the reasons stated, the Court AFFIRMS the Commissioner's decision because it is free of harmful legal error and supported by substantial evidence.

**IT IS SO ORDERED.**

DATED this 22nd day of November, 2017.

STACIE F. BECKERMAN
United States Magistrate Judge